## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| William A. Gerhart, on behalf of himself and the RadioShack 401(k) Plan and the RadioShack Puerto Rico 1165(e) Plan, and/or alternatively on behalf of a class consisting of similarly situated participants and beneficiaries of the Plans,<br><br>                    Plaintiff,<br><br>     v.<br><br>RADIOSHACK CORP., THE ADMINISTRATIVE COMMITTEE OF THE RADIOSHACK 401(K) PLAN, THE ADMINISTRATIVE COMMITTEE OF THE RADIOSHACK PUERTO RICO 1165(E) PLAN, JOHN DOE DEFENDANTS, THE BOARD OF DIRECTORS OF RADIOSHACK, ROBERT E. ABERNATHY, FRANK J. BELATTI, JULIE A. DOBSON, DANIEL R. FEEHAN, H. EUGENE LOCKHART, JACK L. MESSMAN, THOMAS G. PLASKETT, and EDWINA D. WOODBURY,<br><br>                    Defendants. | Case No.:<br><br><br><br>Jury Trial Demanded |

## **COMPLAINT**

Plaintiff William A. Gerhart ("Plaintiff"), on behalf of himself and the RadioShack 401(k) Plan (the "Plan") and the RadioShack Puerto Rico 1165(e) Plan (the "Puerto Rico Plan" and with the Plan the "Plans"), and/or alternatively, on behalf of a class consisting of similarly situated participants and beneficiaries (the "Participants") of the Plans, by his attorneys, alleges the following for his Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to Plaintiff, which are based upon

personal knowledge.  Plaintiff may, after discovery and/or disclosure proceedings in this case, seek leave to further amend the Complaint to add new parties or claims.

## NATURE OF ACTION

Plaintiff, a Participant in the Plan during time periods relevant to the Complaint, bring this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for Plan-wide relief based upon the Plans' purchases and holdings of shares of common stock of RadioShack Corporation ("RadioShack" or the "Company") or units of any RadioShack Stock Fund (the "Fund")[1] at any time from year end 2011 to the present, inclusive (the "Relevant Period").[2]  Plaintiff brings this action on behalf of the Plans pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2).   As more fully set forth below, Defendants breached their fiduciary duties to Participants, including those fiduciary duties set forth in ERISA Section 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550.  Plaintiff thus brings this action as Participants seeking Plan-wide relief for breaches of fiduciary duty on behalf of the Plans.

In the alternative, Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(1) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class of persons similarly situated (the "Class"):

> All current and former Participants in the Plans for whose individual accounts the Plans held shares of RadioShack stock or units of the Fund at any time during the Relevant Period.

---

[1] Fund units and RadioShack common stock in the Plans are used interchangeably herein.

[2] Plaintiff reserves his right to seek modification of the Relevant Period if discovery reveals a more appropriate time period.  *See, e.g., Lively v. Dynegy*, No. 05-CV-00063, 2007 WL 685861, at *6 (S.D. Ill. Mar. 2, 2007) ("the proper termination date of the proposed class period is the date when Dynegy stock ceased to be, as Plaintiff alleges, an imprudent investment for the Plan").

Plaintiff alleges in Count I that Defendants, each having certain responsibilities regarding the management and investment of Plans assets, breached their fiduciary duties by: (i) failing to prudently and loyally manage the Plans' investment in Company stock; (ii) investing Plans assets in Company stock when it was imprudent to do so; (iii) failing to provide complete and accurate information to Plans' participants regarding the Company's financial condition and the prudence of investing in Company stock; and (iv) maintaining the Plans' pre-existing significant investment in Company securities when they were no longer prudent investments for the Plans. These actions/inactions run directly counter (a) to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement (*see* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY")) and (b) upon information and belief, the purpose of the Plans (*i.e.*, to save for retirement).

Plaintiff alleges in Count II that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plans' assets were delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering RadioShack stock as an investment option and investing Plans' assets in RadioShack stock when it was imprudent to do so.

Plaintiff alleges in Count III that Defendants breached their co-fiduciary duties.

Plaintiff alleges that Defendants allowed the significant imprudent investment of the Plans' assets in RadioShack stock throughout the Relevant Period. Defendants knew or should have known that such investment was imprudent because during the Relevant Period RadioShack was attempting (unsuccessfully) to reinvent itself as a viable corporation, but the markets and its reported results made it clear that it was highly unlikely to be able to survive, as detailed below.

During the Relevant Period, the significant investment of Plans Participants' retirement savings in Company stock resulted in significant losses to the Plans and Participants' retirement savings. Nevertheless, Defendants continued to allow the Plans to offer the Fund as an investment option and to allow the Fund to hold and purchase RadioShack stock in individual Participant accounts. Despite the discretion they were given by both the Plans and by ERISA, the Defendants/fiduciaries did nothing to protect the Plans and the Participants as the Company's problems snowballed and the Company's stock price plummeted.

This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, which specifically authorize participants, such as Plaintiff, to sue for relief to the Plans for breaches of fiduciary duty such as those alleged herein. ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), authorize participants, such as Plaintiff, to sue in a representative capacity for losses suffered by the Plans as a result of breaches of fiduciary duty and/or pursuant to Fed. R. Civ. P. 23.

## JURISDICTION AND VENUE

Plaintiff's claims arise under and pursuant to ERISA Section 502, 29 U.S.C. § 1132.

This Court has jurisdiction over this action pursuant to ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this District, breaches of fiduciary duty took place in this District, and one or more Defendants reside or may be found in this District.

4

## THE PARTIES

### Plaintiff

Plaintiff William A. Gerhart ("Gerhart") is a resident and citizen of the State of Texas. Plaintiff Gerhart was employed by RadioShack (or a subsidiary or division of RadioShack) for almost thirty years, until December of 2014, and maintained an investment in RadioShack stock through the Fund in the Plan during the Relevant Period.

### The Company

Defendant RadioShack is engaged in the retail sale of consumer electronics goods and services through the Company's RadioShack store chain.  The Company is incorporated in Delaware and maintains its principal place of business at 300 RadioShack Circle, Fort Worth, TX 76102.  The Company actively conducts business within and from Dallas County and in this District.

RadioShack was the Plans' sponsor and was a fiduciary of the Plans at all times relevant to the Relevant Period.  RadioShack breached its fiduciary and co-fiduciary duties as described below.

RadioShack, acting through its Board of Directors, appointed the persons who managed and administered the Plans on a day-to-day basis.  RadioShack is legally responsible for the malfeasance of its Board of Directors and appointed persons alleged herein.

Instead of delegating fiduciary duties for the Plans to outside service providers, RadioShack internalized the Plans' fiduciary functions and, upon information and belief, appointed its officers and senior executives as Plans fiduciaries.

### The Committee Defendants

According to Forms 11-K filed with the SEC on behalf of the Plan, "[t]he Plan is administered by an Administrative Committee [the "Committee"] appointed by the Board of

Directors of the Company.  The Company's Board of Directors has appointed Wells Fargo Bank, National Association ('Wells Fargo') as the Plan's trustee."  Similar disclosures with respect to the Puerto Rico Plan state that "[t]he Plan is administered by an Administrative Committee [the "Puerto Rico Committee", and with the Committee the "Committees"] appointed by the Board of Directors of the Company. The Company's Board of Directors has appointed Banco Popular de Puerto Rico ('Banco Popular') as the Plan's trustee and Wells Fargo Bank, National Association ('Wells Fargo') as the Plan's custodian and recordkeeper."

At all times relevant to this Complaint, Defendant Committees managed and administered the Plans and the assets of the Plans and acted as a fiduciary with respect to the Plans.

The Committees' members, who are unknown to Plaintiff at this time, are, without limitation, the John Doe Defendants, and were Plans fiduciaries by virtue of serving on the Committees.

The Committees and the John Doe Defendants are referred to herein collectively as the "Committee Defendants."

**The Monitoring Defendants**

According to the Forms 11-K quoted above, the Committees are appointed by the Company's Board of Directors (the "Board").  Because the Board and its members were responsible for appointing the Committee Defendants, who administered the Plan, the Board and its members were also Plans fiduciaries and are named as defendants herein.

The following Defendants served as Board members, and thus as Plans fiduciaries, during the Relevant Period:  Robert E. Abernathy, Frank J. Belatti, Julie A.  Dobson, Daniel R. Feehan, H. Eugene Lockhart, Jack L. Messman, Thomas G. Plaskett, and Edwina D. Woodbury (collectively and with the Board the "Monitoring Defendants").

The Monitoring Defendants were responsible for appointing and monitoring the Committee Defendants.  The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform the Committee Defendants of the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform the Committee Defendants of the true financial and operating condition of the Company (including the financial and operating problems being experienced by RadioShack during the Relevant Period identified herein) but nonetheless continued to allow such persons to offer RadioShack stock as an investment option under the Plans when RadioShack stock was not a prudent investment for Participants' retirement accounts under the Plans, thus breaching their duty to monitor the Committee Defendants.  Liability is only asserted against each of the Monitoring Defendants for such periods of time as each Monitoring Defendant acted as a fiduciary with respect to the Plans.  The Monitoring Defendants were directors and/or officers of the Company and knew or should have known of the Company's problems as described herein.

## ALTERNATIVE CLASS ACTION ALLEGATIONS

As noted above, Plaintiff brings this action derivatively pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3). Alternatively, Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1)(B) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class defined in paragraph 0.

The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at minimum, thousands of members of the Class.  The Plan's 2012 Form 5500 lists 19,174 Plan Participants as of

December 31, 2012, and the Puerto Rico Plan's 2012 Form 5500 lists 414 Participants as of December 31, 2012.

Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to all members of the Class are:

      (a)      Whether Defendants were Plans fiduciaries;

      (b)      Whether Defendants breached their fiduciary duties to the Plans, Plaintiff and/or the members of the Class;

      (c)      Whether the Plans and the Participants were injured by such breaches; and

      (d)      Whether the Plans and the Participants are entitled to damages and/or injunctive relief.

Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and all other members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in class action ERISA litigation.  The interests of Plaintiff are coincident with and not antagonistic to the interests of the other members of the Class.

Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the

Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## DESCRIPTION OF THE PLAN

At all times relevant to this Complaint, the Plans were employee benefit plans within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

At all times relevant to this Complaint, the Plans were "defined contribution" or "individual account" plans within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plans provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and for any income, expenses, gains and losses, and any forfeitures of accounts of other Participants that could be allocated to such Participant's accounts.

At all times relevant to this Complaint, the Plans provided a number of different options for investment of the Plans' assets, including the Fund.

At all times relevant to this Complaint, Participants were allowed to direct the Plans to purchase investments from among the investment options available under the Plans and allocate them to their individual accounts.  The investment options made available to Participants were selected solely by, and at the discretion of, the Plans' fiduciaries.

The Plan's annual report for the fiscal year ended June 30, 2013, filed with the SEC on Form 11-K, (the "2013 11-K")[3] states, among other things:

> The following description of the RadioShack 401(k) Plan (the "Plan") provides only general information. Participants should refer to the Summary Plan Description, which also constitutes the Plan's prospectus, for a more complete description of the Plan's provisions.

---

[3] www.sec.gov/Archives/edgar/data/96289/000009628913000036/form11k063013.htm.  There is a substantially similar disclosure in the analogous filing for the Puerto Rico Plan, *available at* www.sec.gov/Archives/edgar/data/96289/000009628913000038/form11kpr063013.htm.

## 1.      Description of the Plan

**General**

The Plan is a defined contribution employee benefit plan covering eligible employees of RadioShack Corporation, its divisions and subsidiaries (the "Company" or "RadioShack"). The Plan is an individual account plan with multiple, participant-directed investment options and conforms to and qualifies under Section 401 of the Internal Revenue Code (the "Code"), as amended. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

At June 30, 2013 and 2012, there were 2,976 and 3,003 employees of the Company participating in the Plan and 14,616 and 14,086 employees eligible to participate, respectively. The Plan is fully participant directed, and available investments consist of RadioShack common stock, registered investment companies and money market funds.

**Administration**

The Plan is administered by an Administrative Committee appointed by the Board of Directors of the Company. The Company's Board of Directors has appointed Wells Fargo Bank, National Association ("Wells Fargo") as the Plan's trustee.

**Eligibility**

An employee is eligible to participate in the Plan immediately such that an employee's entry date shall be as soon as practicable following the employment date. For the purpose of Company matching contributions, an employee shall become a participant on the payroll period following the date on which the employee completes one year of service. A "year of service" means a consecutive twelve month period during which he or she completes at least 1,000 hours of service with RadioShack. An "hour of service" is each hour for which one is entitled to be paid by the Company (1) for the performance of duties, (2) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, or other similar reason, or (3) as back pay either awarded or agreed to by the Company.

**Participant Contributions**

Through authorized payroll deductions, participants may contribute, on a pre-tax basis, up to 75%, in increments of 1%, of their annual compensation. During the Plan year ended June 30, 2013, in

accordance with the provisions of the Code, participants generally could not elect more than $17,500 in pre-tax contributions during the 2013 calendar year. Participants who were age 50 and over in 2013 were permitted to contribute additional "catch-up" contributions of up to $5,500 during the calendar year.

Participants may direct their contributions into various investment options. Participants may elect to allocate their total contributions to the various investment options in increments of 1% and may change their investment options daily, subject to certain restrictions on such changes imposed by the Plan's investment funds.

Participants are not subject to federal income taxation on their contributions and earnings on Plan investments until withdrawn from the Plan.

Distributions from another qualified plan can be transferred into the Plan. During the Plan years ended June 30, 2013 and 2012, rollover accounts in the amount of $635,124 and $351,765, respectively, were transferred into the Plan and are included in participant contributions on the statements of changes in net assets available for benefits.

**Company Contributions**

All Company contributions are discretionary and may change or be suspended in future years. Through June 30, 2013, the Company contributed an amount to each participant's account maintained under the Plan equal to 100% of the participant's contributions up to 4% of his or her annual compensation. Company contributions are made directly to the Plan, are made in cash, and are invested in accordance with the Plan.

**Participant Accounts**

Each participant's account is credited or debited with the participant's contribution and allocations of (1) the Company's discretionary matching contribution, and (2) Plan earnings or losses. Allocations are based on the participant's contribution or number of shares held, as defined by the Plan. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account.

**Vesting**

Effective July 1, 2006, active participants own 100% of the balance in their Plan accounts, including their matching account.

**Benefits Paid to Participants**

Participants who withdraw from the Plan may receive the vested portion of their accounts under one of four withdrawal methods summarized as follows:

(a)     Single lump sum payment in cash;

(b)     Part cash and part securities;

(c)     If account balance exceeds $5,000, monthly installments not to exceed ten years; or

(d)     A direct rollover to an eligible retirement plan.

The Plans' Forms 11-K show the following for Plans holding of RadioShack stock:

| | Plan Shares | Value of Plan Shares | Puerto Rico Plan Shares | Value of Puerto Rico Plan Shares |
|---|---|---|---|---|
| June 30, 2011 | 2,973,742 | $39,580,506 | 60,115 | $800,131 |
| June 30, 2012 | 3,264,115 | $12,534,202 | 73,506 | $282,263 |
| June 30, 2013 | 3,560,569 | $11,251,398 | 94,404 | $298,317 |

Throughout the Relevant Period, RadioShack common stock was not a prudent investment for the Participants' individual retirement accounts under the Plans because of the likelihood of the Company's bankruptcy.

## ADMINISTRATION OF THE PLANS

Defendants, as fiduciaries of the Plans, were required by ERISA to furnish certain information to Participants. For example, ERISA Section 101, 29 U.S.C. § 1021, requires a plan's administrator to furnish a Summary Plan Description ("SPD") to the plan's participants. ERISA Section 102, 29 U.S.C. § 1022, provides that an SPD must apprise participants of their rights and obligations under the plan. In addition, every person who held RadioShack stock in a Plans account annually received a Proxy Statement which purported to describe (including through the incorporation of other company documents) the business and operations of RadioShack.

At all times relevant to this Complaint, Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plans' assets allocated to their accounts.

At all times relevant to this Complaint, Defendants had a duty to review the Plans' investment policies, as well as the selection and the performance of investment alternatives offered under the Plans. There was no requirement that any assets of the Plans be invested in Company stock or that Company stock be continued as an investment alternative.

At all times relevant to this Complaint, Defendants other than RadioShack had a duty to obtain from the Company information necessary for the proper administration of the Plans.

At all times relevant to this Complaint, Defendants were fiduciaries of the Plans as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management of the Plans or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plans.

Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

## RADIOSHACK STOCK WAS, AND CONTINUES TO BE, AN IMPRUDENT INVESTMENT FOR THE PLAN

Despite ten consecutive quarterly losses, the fact that RadioShack was hemorrhaging cash and increasing its debt as its stock price plummeted—thus increasing its debt/equity ratio—as it tried to reinvent itself so that it could increase its likelihood of survival, the Plans' fiduciaries continued to allow Participants to hold and further invest their retirement savings in the Fund.

Plaintiff does not allege that the Defendants failed to outsmart an efficient market. To the contrary, Defendants ignored the extreme risk of bankruptcy priced into the Fund which made

RadioShack stock an imprudent and unduly risky vehicle for retirement savings.  Defendants ignored this risk in violation of their ERISA fiduciary duties.

As has been repeatedly noted in the press, the assumptions upon which RadioShack's "current businesses were built are no longer valid. The things that management assumed to be true when the companies were wildly profitable 2 or 3 decades ago are no longer true. And no matter how much leadership focuses on metrics, operational improvements and cost cutting - or even serving the remaining (if dwindling) current customers - the shift away from these companies' offerings will not stop. Rather, that shift is accelerating."  *See* http://startupadda.in/wrong-assumptions-create-lousy-outcomes/.

As a result, analysts have warned that "a bankruptcy reorganization [of RadioShack] is imminent" and that the Company's equity is likely to be wiped out.  *See* http://blogs.wsj.com/moneybeat/2014/09/10/analyst-on-radioshack-bankruptcy-is-imminent/.

This is not a case alleging ERISA fiduciaries failed to outsmart an efficient market; this is a case alleging ERISA fiduciaries *ignored* an efficient market and clarion calls of RadioShack's impending bankruptcy, instead believing that they knew better.  Whether priced efficiently or not, RadioShack was unduly risky for retirement savings during the Relevant Period because of its unusually high risk of bankruptcy.

On November 16, 2011, *Zacks Investment Research* reported in an article entitled "RadioShack Suffered a Setback – Analyst Blog" that:

> Yesterday, RadioShack Corp. (RSH) suffered a setback as Standard & Poor's Ratings Services (S&P) downgraded the company's credit rating by one notch. S&P downgraded the corporate credit rating of RadioShack from BB to BB-. This ***rating assignment is in the junk territory of S&P and three notches below the rating agency's investment grade territory***. The primary reason of this downgrade, as explained by S&P, is its expectation that weak operating performance of RadioShack will continue in 2012.

> The nightmare of RadioShack persists as the company continues its disappointing performance. The company's results fell below the Zacks Consensus Estimates in the third quarter of 2011. Precipitous decline of the core consumer electronics retail businesses, adverse product-mix toward low-margin devices, and a volatile macro-economic scenario in the U.S. are taking toll on the company's financial condition.
>
> According to S&P, the lucrative wireless division of RadioShack, which accounted for half of its total revenue, will witness a flat to modest sales growth in 2012….

(emphasis added).

At the end of the fourth quarter of 2011, RadioShack reported earnings per share of 12$^{\cent}$. The prior quarter, the Company had broken even.  It has not had a profitable quarter since, and it's apparently imminent bankruptcy has been repeatedly predicted by the market, with the drumbeat growing louder.  Instead of acting with an eye single towards protecting Participants' retirement benefits, the Plans' fiduciaries allowed Participants to imprudently gamble retirement savings on RadioShack's future—a future which the markets increasingly predicted would not exist.

On July 25, 2012, *Dow Jones Factiva* reported in an article entitled "WSJ BLOG/MarketBeat: RadioShack's Troubles Mount: Stock is 'Dead Money'" that "The enduring mystery that is RadioShack turned even more dour and depressing this morning. The consumer electronics retailers reported a surprise second-quarter loss and said it would stop paying a dividend. Shares have [] lost a third of their value this morning and are trading at levels last seen in 1980 on a split-adjusted basis. 'RadioShack's financial performance went from bad to worse,' said Anthony Chukumba, an analyst at BB&T Capital Markets. 'We think the stock will be *'dead money' at best until current trends begin to show some sign of stabilizing*. . . . The big looming question is whether the company will ever regain its footing or go the way of Circuit City.'" (emphasis added).  The article noted of one analyst's opinion:

Stifel Nicolaus downgraded the stock to hold from buy and pulled its $9 price target. In a mea culpa of some sorts, Stifel analyst David Schick admitted his call on RadioShack has "been obviously quite wrong-footed for some time. "

Schick said one of the main flaws with his thought process on RadioShack was getting sucked into believing the financials would improve when it started selling Apple's iPad.

"Ironically and importantly it's a core, painful lesson we take from this call -- judge the company on its core business proposition," Schick said.

The broad takeaway isn't a pretty one for RadioShack.

"We have little confidence in RadioShack's ability to earn a profit stream given their (and our) inability to see this coming," Schick says.

On August 1, 2012, the *Fort Worth Star-Telegram* (Texas) reported in an article entitled

"Is RadioShack a bankrupt dinosaur?" that:

RadioShack is in a slump of historic proportions, with its stock price falling to an all-time low recently. Now Bloomberg News has put the spotlight on RadioShack's performance in the bond markets, and it's just as ugly.

In addition to debt-rating agencies downgrading its notes, the price of credit default swaps is soaring; the instruments are used as insurance in case the company reneges on interest and principal payments.

A swap to protect $10 million in RadioShack notes sells for $3.8 million up front, Bloomberg reported. The same swap cost $966,000 in January.

The prices of the derivatives imply an 84 percent chance of default within five years, wrote reporter Mary Childs. Kodak hit that level six months before filing for bankruptcy, and American Airlines' parent reached it two months before filing.

RadioShack notes due in 2019 are selling for 65 cents on the dollar, down from 90 cents in January.

Melissa Weiler, a money manager, said the market appears surprised that the company has survived. Other analysts cited the tired

> business model, the cash-burn rate and the lack of a catalyst for improvement.
>
> "RadioShack seems to be one of a few dinosaurs remaining out there," Weiler told Bloomberg.
>
> The company's directors haven't given up, and on Friday, they bought some beaten-down shares to prove it. But as in its retail business, **RadioShack is losing the confidence game.**

(emphasis added).

An October 7, 2012 DallasNews.com article entitled "It's make-or-break time for faltering RadioShack" stated that:

> When a company runs out of ideas, inspiration and investor confidence, it needs more than a new CEO. RadioShack needs a hero.
>
> The Fort Worth retailer ousted its chief executive on Sept. 26, well after trouble appeared and just ahead of the crucial holiday sales period. Risking a leadership change now, before its biggest quarter for sales and profit, is a **sign of desperation**.
>
> Certainly, **Wall Street's confidence is shot**. The stock price fell to $2.02 a share last week, down from $9.59 in January. In five years, RadioShack has lost more than 90 percent of its market value.
>
> Here's why: RadioShack's net income totaled $206 million in 2010. That declined to $72 million last year, and in the first six months of 2012, the company slipped into the red, losing $29 million.
>
> At this rate, how long before RadioShack holds a going-out-of-business sale?
>
> Rivals are everywhere, from the Internet to big-box retailers to pharmacies selling hearing aid batteries next to the prescription counter. The company's one growth category, smartphones, has shrinking margins and competes with 8,000 retail stores run by wireless carriers such as AT&T and Verizon. RadioShack's most important partners are among its toughest competitors.
>
> In July, after the second-quarter loss, CEO James Gooch didn't seem alarmed. "In simple terms, we need to rebuild consumers' knowledge of our brand, helping to better communicate the breadth of products and services we offer," Gooch told analysts in a

conference call. "We need to do a better job telling customers all of the positives they will find when they visit our stores."

That boilerplate message should've been delivered soon after Gooch arrived as chief financial officer in August 2006. Better communication never hurts, but at this stage, he was prescribing an eyebrow tweeze in place of major surgery.

"They never worked out who they are at RadioShack," said Michael Pachter, an analyst at Wedbush.

In need of a leader

After the loss, Pachter set a target price of $1 for RadioShack stock, the range for bankruptcy candidates. Fitch Ratings and Standard & Poor's downgraded RadioShack debt, pushing it deeper into junk territory. And late last month, RadioShack had to pay 11 percent interest for a bank loan.

"There is a lack of stability in the business and no apparent catalyst to stabilize or improve operations," Fitch wrote in July.

Two months later, Gooch was out, and the board started looking for a successor. It's a make-or-break hire because RadioShack has no guarantees, despite almost a century of history. It could follow Circuit City and Bombay Co., which failed to adjust, or Pier 1 Imports, a great turnaround.

(emphasis added).

On October 8, 2012, Fitch downgraded RadioShack's senior unsecured notes further into junk territory, citing "disappointing results," profitability drops that have "become progressively more pronounced over the last four quarters," and a "marked deterioration in the company's credit profile." By Fitch's calculations, the company's leverage increased to 6.8 times its earnings before interest, taxes, depreciation and amortization, or Ebitda, on June 30, 2012, from just over five times its Ebidta at the close of 2011. The ratings agency said it expects RadioShack's leverage to trend above seven times its Ebidta over the next two years as the company's earnings "will likely erode further." "There is a lack of stability in the business and no apparent catalyst to stabilize or improve operations," Fitch said in the report.

On October 15, 2012, *Dow Jones Daily Bankruptcy Review*, which covers news about distressed companies and those under bankruptcy protection, reported that analysts were warning that "RadioShack Corp. (RSH), which once drew in customers looking to buy electronic gadgets and supplies close to home, ***is struggling to figure out its purpose in an age in which the competition is cranked up and its balance sheet is battered***." (emphasis added). It reported that analysts were noting that RadioShack "doesn't stand for anything", and that ""they've got to figure out how to find their niche[.]" ISI Group analyst Oliver Wintermantel noted it was a crucial time for the Company because upcoming debt due will challenge the Company's liquidity and survival: "I don't think anyone believes it has a real business model to it," he said of RadioShack. "If you know you don't have a light at the end of the tunnel, why try to buy yourself that time?" he further stated that "The writing is certainly on the walls," he said. "It's one of the weakest retailers that we cover." Similarly, the article reported that Fitch analyst Augustinus Wong stressed that the Company is in need of a major shift in strategy.

On the November 20, 2012 episode of *Jim Cramer's Mad Money*, Mr. Cramer stated "How about RadioShack? That company is on death's door."

By the start of 2013, as reported in the January 12, 2013 edition of *The Greenville News* (South Carolina) in an article entitled "Retailer clings to phone profits"

> Derivatives traders are signaling RadioShack is headed toward default as the electronics retailer finds itself cornered into the low-margin mobile phone business.
>
> Credit-default swaps linked to RadioShack's debt imply the market perceives it as C rated, according to Moody's capital markets research group, which means investors have "little prospect for recovery of principal or interest." The Fort Worth, Texas-based electronics chain, currently rated B3, is now poised for its fourth downgrade in a year, data compiled by Bloomberg show.
>
> While RadioShack has enough cash to retire the rest of a $375 million convertible bond issue that matures in August after

repurchasing $88 million of the securities in the third quarter, competition for electronic products from televisions to cable connectors from online and discount retailers such as Amazon.com to Wal-Mart Stores is pushing margins close to a 15- year low. That leaves RadioShack, along with rivals such as Best Buy, stuck with thin-margin mobile phones for revenue.

"Smartphones are cannibalizing their sales," Manoj Chadha, a senior analyst in Moody's Investors Service corporate finance group in New York, said in a telephone interview. "You're replacing a higher-margin product with a much lower-margin product, but they didn't have much of a choice."

* * *

RadioShack, which has been generating free cash flow since 2000, is now burning cash, Bloomberg data show. It's expected to show a burn of $29.1 million for 2012 and $53.4 billion this year, according to analysts surveyed by Bloomberg. Free cash is money available for debt retirement, shareholder rewards and reinvestment in a company's business.

* * *

Bonds graded C by Moody's Investors Service are considered the "lowest rated class" and are "typically in default." Standard & Poor's rates RadioShack CCC+, one level below the current Moody's rating.

* * *

"The story of how bad it is, is so real and yet somehow they always figure something out," Peter Tchir, founder of New York-based TF Market Advisors, said in a telephone interview. He estimated it's in the top five of all time of credit derivatives that people have lost money trading. "How RadioShack still exists is in many ways beyond me, and yet somehow they always manage to do it. The smart trade never seems to work."

RadioShack got a $50 million term loan extension from Bank of America in August, a new $100 million five-year term loan at 11 percent interest with Wells Fargo & Co. in September, and a $25 million term loan extension in October. The company will use the proceeds, plus existing cash, to repay its convertible notes.

"This strikes the right balance of maintaining liquidity necessary to ensure smooth operations of our company and deleveraging the balance sheet," Lively said in an Oct. 23 statement.

>The $175 million RadioShack raised in the loan market last year gave Joscelyn MacKay, a credit analyst at Morningstar in Chicago, "a little more confidence" in the company.
>
>"They're eking things out," she said in a telephone interview. While it has more than $500 million in cash and $400 million in a credit facility, she said, "they're always just skating by."

On December 26, 2013, *TheStreet.com* reported in an article entitled "News & Analysis; Retail" that

>This year's holiday season will mark the last one for RadioShack in its current form, forecasts Brian Sozzi, CEO and Chief Equities Strategist for Belus Capital Advisors.
>
>"The main reason for **RadioShack's extinction**: it sells nothing of relevance for new tech upgrade cycles or the actual devices in the new tech upgrade cycle," Sozzi says. Ouch.
>
>So, what can go in the empty storefronts? "Google pop up shops, or even Wal-Mart pick up locations," Sozzi says.
>
>***In all fairness, Wall Street has been predicting RadioShack's demise for many years.*** Perhaps the prediction could turn out the other way around, and Radio Shack re-energizes 2014's comeback kid. Well, don't count on it.

(emphasis added).

In March of 2014, RadioShack said it needed to close 1,100 stores, or about 20% of its total stores. But three months later, it was forced to scale back to only 200 store closings when lenders balked at providing the cash needed to close more stores.

On March 4, 2014, *The Economist* reported in an article entitled "Dead Brand Walking" that:

>AT THE start of RadioShack's advertisement in this year's Super Bowl, a worried-looking sales assistant takes a call, puts down the phone, then announces to his fellow salesman: 'The 80s called. They want their store back.' Then a host of 80s icons (pictured) from Hulk Hogan to Chucky rip apart the typically tired RadioShack store, and make off in the time-travelling DeLorean from 'Back to the Future'. The voiceover: 'It's time for a new RadioShack.'

*Unfortunately for the storied consumer-electronics retailer, it is way past time.* A dreadful 2013 holiday sales season left RadioShack's fourth-quarter sales down 20% on the same period of 2012, at $935 million. Discounts also bit deeply into the firm's gross profit margin for the quarter, which fell by six percentage points to 29.8%. On March 4th Joseph Magnacca, RadioShack's chief executive, announced that the company will close 'up to 1,100 underperforming stores'—one-fifth of its total. That will leave it with a still-unwieldy network of more than 4,000 stores in America, 900 of which are franchised, plus 1,200 or so outlets abroad. The company's shares were down 18% at the time of writing.

The dismal end to 2013 also left RadioShack with only about $180 million of cash on hand (down by two-thirds from the previous year-end) and total debt of $614 million. In December the company secured $835 million to refinance its existing debt (among other things). That financing round included a $585 million asset-based credit agreement, and a $250 million secured loan. In other words, RadioShack has bought itself a little time, but not much for a company with such a large store footprint and so many challenges.

RadioShack has been part of America's retail landscape for more than 90 years: it was established in Boston in 1921 to serve the needs of radio officers aboard ships. But as its self-deprecating Super Bowl ad made painfully clear, many of its stores look like they were last revamped in the 1980s. And the company's customers—which traditionally visited the store to buy bits and pieces for their electronic hobby projects—have aged with it.

Ask Americans under the age of 30 what they buy at 'The Shack', and you will be greeted with a blank look. For today's younger consumers the brand isn't associated with anything they need. The firm may have been one of the first retailers to sell mobile phones (back in the 1980s, naturally) and it may have sold 73m since then. But today's consumers mostly buy their phones directly from the wireless carriers—or head for the Apple Store. On a recent evening in one of the Washington, DC, metro area's biggest malls, the Apple Store was packed; RadioShack was deserted. This is bad news for a company that relies on mobile phones, computing tablets and related gadgets for around half its dwindling sales.

RadioShack isn't alone in its woes, although it was by far the hardest hit this holiday season. Rivals such as Best Buy and Gregg Appliances (which does business as h.h. gregg) also saw declines in sales thanks to Scrooge-like consumer spending, severe weather, weak mobile phone sales and price-cutting. It is hard to imagine that smaller privately owned competitors such as Micro Center weren't

hit too. Even Amazon missed Wall Street's expectations for the holiday quarter, and warned of a potential operating loss in the subsequent one.

The difference is that despite disappointing financial analysts, Amazon still saw its North American sales soar by 26% in the holiday quarter, to $15.3 billion. And in the consumer-electronics sector, Amazon's gains are losses for primarily bricks-and-mortar retailers such as Radio Shack. They are struggling to gain a credible online foothold (a 26% year-on-year increase in Internet sales was a modest bright spot for Best Buy last quarter), but none can match Amazon's breadth, economies of scale and logistics. RadioShack keeps quiet about its own online sales.

Mr Magnacca, a marketing executive who joined RadioShack just over a year ago from Walgreen, a pharmacy chain, has been struggling to turn around his new charge. Its stores are gradually being modernised, the number of products it carries has been cut, and the firm is trying to woo a younger audience by teaming up with companies such as Beats Electronics, a maker of trendy headphones.

But for RadioShack this may all be too little, too late. Its market share continues to fall—by 20% since 2010 according to Euromonitor International—and its brand is tired and increasingly irrelevant. For some, all this brings back memories of Circuit City, the giant American electronics retailer that suffered from many of the same woes before going bust in 2008. RadioShack's Super Bowl ad may have been tongue-in-check, but in many ways it probably does wish it could take that DeLorean back to the 80s—and start building a new RadioShack back then.

(emphasis added)

Also on March 4, 2014, a *Dow Jones Institutional News* article entitled "Tough to See Where RadioShack Can Turn Now -- Market Talk" reported in relevant part "'4Q results 'highlight a company with few options,' Janney writes. Firm says RSH's earnings press release 'reads somewhat like the Circuit City press releases of 2008,' before it filed for bankruptcy. 'Circuit City talked of some wins, and other positives including store remodels…. *The simple math is that gross profit was $288 million in Q4 versus SG&A dollars of $389 million. We don't see a path to reversing this decline*." (emphasis added).

On March 5, 2014, *DallasNews.com* reported in an article entitled "Fading RadioShack may close 1,100 stores" that:

> It's getting harder to be RadioShack.
>
> The ubiquitous little stores around the corner have filled the everyday electronic needs of multiple generations. But RadioShack Corp.'s holiday sales fell 20 percent, and now it's closing 25 percent of its stores.
>
> The Fort Worth-based retailer said Tuesday that it will close up to 1,100 unprofitable stores this year after posting its second consecutive annual loss.
>
> RadioShack will have about 3,100 company-operated stores and 900 franchise stores after the cuts this year.
>
> The 90-year-old company is trying to fit into a crowded consumer electronics space. CEO Joe Magnacca put the problem this way: There are eight RadioShack stores within 5 miles of his house in Fort Worth.
>
> Magnacca, who came to RadioShack a year ago from Walgreens, has said before that the turnaround will take longer than he had expected. On Tuesday, he added that *a lot of the company's basic retail processes were broken when he got there and that the turnaround started at a lower point than he expected.*
>
> Magnacca also said efforts to remove slow-moving products from stores sometimes went too deep.
>
> Other problems during the quarter: Wireless business revenue fell 23 percent. Deep discounting by competitors during the holiday season hurt results even though RadioShack did its own price-matching.
>
> RadioShack also lowered the value of its business in Mexico, taking a one-time charge as sales fell 10 percent. Now it has a turnaround situation there, too.
>
> "We exceeded our organization's capabilities by trying to do too much too quickly," Magnacca told analysts.
>
> Magnacca said he's pleased with the traffic and sales at the 100 new concept stores he opened last year. The stores have interactive displays where people can find the best choice of headphones for their own devices and see a 3-D printer in action. In North Texas,

two concept stores opened in October in Fort Worth's Sundance Square and Montgomery Plaza.

"This is a good management team, and they're doing the right things, but *it's 10 years too late for RadioShack*," Wedbush analyst Michael Pachter said. "They should have done all this 10 years ago. *Now they're in desperation mode*. It's going to take more than a clever Super Bowl ad."

(emphasis added).

On March 11, 2014, *DallasNews.com* reported in an article entitled "For RadioShack, it's 'try, try again' again" that:

Smokers sometimes joke that it's easy to quit cigarettes; they've done it lots of times.

Reinventing RadioShack feels the same. Every few years, executives hunt for new ways to keep the company relevant, but most don't stick. So they keep returning to the theme.

Years ago, RadioShack went large with Incredible Universe and Computer City. Then it went tiny with kiosks in Target and Sam's Club. It once manufactured computers and laptops.

In 2009, it was rebranded as "The Shack" and later threw its promotional weight behind Lance Armstrong.

None of that worked out well, but it wasn't for lack of effort. That's worth recalling as new leaders try to reinvent the Fort Worth retailer again.

Does RadioShack have another life?

Last week, the electronics chain reported its worst holiday quarter in decades and announced a plan to close 1,100 company stores. Analysts talked of bankruptcy, the debt was downgraded, and the stock traded at $2 a share.

A decade ago, RadioShack was a cash cow with a profit margin of 50 percent. Online rivals and big-box retailers have steadily chipped away at that margin. After the disastrous holiday quarter, RadioShack is also running low on money.

The board granted retention bonuses to five executives, which is usually a Chapter 11 move. And MarketWatch called RadioShack a zombie retailer.

"The RadioShack turnaround will take time and our results will vary," CEO Joe Magnacca told analysts last week. ***"We believe our fourth-quarter numbers do not reflect the progress we are making."***

(emphasis added).

On May 8, 2014, *24/7 Wall St.* reported in an article entitled "Could RadioShack's Stock Plunge to Zero?" that:

> The need to close a large number of locations is not hard to make financially. RadioShack's revenue was $4.2 billion in 2010. Last year, that dropped to $3.3 billion. RadioShack earned $206 million in 2010. Last year, it lost $400 million. ***With losses like that, the company is probably not viable, at least as it is constituted now.*** That is the view of Wall Street. Its stock trades at a pathetic $1.47, down 70% in two years, against an SP 500 increase of 30% over the same period. With a market cap of only $147 million, RadioShack trades like a candidate for Chapter 11, which it probably is.
>
> RadioShack's creditors can be certain of one thing. If the company does go into bankruptcy, common shareholders will bear the burden of losing all of their money. Lenders may lose nothing — one of the advantages of that status.
>
> The brick-and-mortar retail business is like airlines were for generations. The best way to scrub balance sheets is via bankruptcy[]. It is also the best way to eliminate unwanted assets, which often include people, if they can be referred to that way. The move to block the RadioShack store closings may be a move by creditors to control the company, and its future, by eliminating its status as a public corporation. No shareholders to bother with. No SEC filings. No prying eyes.
>
> RadioShack's stock may well trade for pennies very soon, particularly if its next quarterly report looks like its full year 2013 did. Management will no longer report to a board, and ultimately public shareholders, because there won't be any.

(emphasis added).

On May 15, 2014, a release entitled "Fitch Downgrades RadioShack's IDR to 'CC'" warned, *inter alia*, that "[t]he downgrade reflects the increasing likelihood that RadioShack will need to restructure its debt within the next 12 months" and that "Fitch currently anticipates that

RadioShack has enough liquidity to fund the 2014 holiday season, barring any significant change in vendor terms, but excess liquidity is expected to be very tight which could prompt a restructuring before year-end or early 2015."

On June 3, 2014, *Dallas Business Journal* reported in an article entitled "Magnacca to RadioShack shareholders: 'I don't know if we can overcome this ...'" that CEO Magnacca said at the Company's annual shareholders' meeting "I don't know if we can overcome this impasse, but we'll continue to work at it[.]" The article further noted that "But analysts and stock charts both seem to suggest the end is near, as the retailer is out of areas where it can cut costs."

On June 9, 2014, *TheStreet.com* reported in an article entitled "RadioShack's Earnings Likely to Provide More Reasons for Worry" that "when you factor in the company's high inventory levels, declining cash reserves and upcoming debt maturities, you have to ask how much time does RadioShack have left before it has to file for bankruptcy."  The article also noted that "With no clear signs of a recovery, investors still holding these shares from the $20-plus highs of four years ago should let go now and move on with their lives. Those days are gone. ***Bankruptcy now seems the inevitable outcome.***" (emphasis added).

On June 10, 2014, *Benzinga.com* reported in an article entitled "RadioShack Earnings Preview: Is The Company Going Bankrupt?" reported that:

> An article from the NYSE Post on May 19 suggests that the company is on the "threshold" of bankruptcy after its credit rating was downgraded at Fitch Ratings two weeks ago.
>
> Furthermore, according to data from Markit, RadioShack's recent credit default swaps implied a ***40 percent chance of default by the end of 2014 and a 95 percent chance of default within five years***.
>
> Things just aren't looking good at the company, whose market-cap has dwindled to $144 million.
>
> Over the last five years, shares have lost roughly 91 percent and over the preceding decade the stock is down more than 95 percent.

* * *

RadioShack's poor performance in fiscal Q4 shocked Wall Street, and investors are likely to have little tolerance for more disappointment in the first quarter. Analysts at Wedbush reiterated their Underperform rating on the stock after the March quarter, citing growing losses, declining sales and margin erosion. The firm has a $1 price target on the stock.

The company had planned on closing up to 1,100 stores over the next year, but this cost-cutting move was blocked by lenders. Wedbush analysts wrote that *"the creditors clearly are in control of the ship, and in our view, the ship is sinking."*

(emphasis added).

On June 20, 2014, an article entitled "Your Last and Final Warning on RadioShack" published on *24/7 Wall St.* reported:

Going, going, gone! RadioShack Corp. (NYSE: RSH) has broken the buck. Shares traded under $1 on Friday. If you are a shareholder who is surprised about this, then about the only excuse would be is if your name is Rip Van Winkle. Please consider this a final warning in RadioShack.

24/7 Wall St. has seen *a recent analyst report calling for the value to go to zero*[1], and even a ratings agency call warned of a liquidity implosion[2] back in May. We have warned over and over about this name, and just last week we warned readers that RadioShack needs to immediately file for bankruptcy[3] protection now while it still has some assets to its name.

RadioShack is in such a unique situation that it is a no-win situation. The company could not even strike a bargain basement buyout in recent years, and the company's balance sheet is dwindling by the hour.

Creditors did not allow RadioShack to close the 1,100 or so stores that the company wanted to close. What does that tell you? The note holders and creditors almost certainly are looking to make sure they are the only ones with viable claims by the time the bankruptcy arrives.

The company rents its stores, but it owns the distribution and manufacturing facilities. What those will be worth would be a guess without site inspections.

> It is even sadder to report that RadioShack is worth less than $100 million now in its equity market cap. The company's retail network includes roughly 4,250 domestic company-operated stores, another 258 company-operated stores in Mexico and 912 dealers and other outlets worldwide.

(emphasis added).

RadioShack's stock price was buoyed by the slight chance of its survival during the Relevant Period.  A *CNN Wire* August 27, 2014 article entitled "RadioShack in talks on cash lifeline" reported that:

> RadioShack **may have a future**, after all.
>
> The troubled electronics retailer is in talks with Standard General, which holds nearly 10% of RadioShack shares, to give it a cash infusion, sources familiar with the talks have told CNN.
>
> RadioShack burned through more than 40% of its cash on hand in its most recent quarter ending in May, leaving with only $62 million on its balance sheet. Credit rating agency Moody's has estimated the retailer could run out of cash as soon as next year.
>
> RadioShack did not have an immediate comment on the talks. Standard General partner David Glazek declined to comment.
>
> RadioShack management unveiled a plan earlier this year to close about 1,100 stores, roughly 20% of its total, in an effort to stem losses. It also needs cash to revamp its remaining stores. Its own Super Bowl ad mocked its current stores as hopelessly mired in the 1980s.
>
> But creditors balked at the move to close that many stores, leaving the company without the cash it needed for the turnaround plan. It then unveiled a more modest plan to close 200 stores, but that plan raised new worries that it would soon run out of cash.
>
> Standard General is providing $25 million to help rescue another troubled retailer in which it has taken a large stake - American Apparel, the company that fired its controversial CEO Dov Charney earlier this summer.
>
> RadioShack shares **fell to a record low of 55 cents earlier this month on bankruptcy fears**. But they have rallied since then, jumping nearly 20% in trading Tuesday on initial reports of the

> *rescue talks* on Bloomberg. Shares rose another 7% in early trading
> on Wednesday, although they were still under $1.

(emphasis added).

Based upon the same rescue financing, *Dow Jones Institutional News* had reported the day earlier that "Without a capital infusion the seller of gadgets and batteries will probably face a cash crunch by the quarter ending around November 2015, according to a July 29 report by Moody's Investors Service. RadioShack lost $98.3 million in the three months ending May 3, according to data compiled by Bloomberg."

On August 5, 2014, *DallasNews.com* reported that "RadioShack sales keep dropping, cash is going fast and the stock trades for half a buck. Heck, one analyst has a target price of zero. So why doesn't RadioShack declare bankruptcy already? Maybe that won't fix the problem [because] bankruptcy won't attract more customers or turn losses into profits or slow down Amazon and Best Buy. RadioShack has a tired business model, and thousands of stores must be reinvigorated." The article further warned that reinventing the Company is a "risky, expensive proposition, and lenders are balking. They wouldn't approve RadioShack's plan to close 1,100 stores, more than a quarter of the U.S. chain, because inventory is collateral for company loans." In other words, the Company's interests and the interests of its creditors had clearly diverged. Dallasnews.com compared RadioShack to Circuit City and Blockbuster, "major brands that never recovered" from market shifts, and cautioned that RadioShack's lenders were balking at the Company closing stores (which might be required for the Company to survive), because the inventory in those stores is collateral for the lender.

Also on August 5, 2014, *TheStreet.com* reported in an article entitled "RadioShack Is Running Out of Time and Should Just Pull the Plug" that "Back in June I told you electronics retailer RadioShack was sending out bankruptcy signals. Had you listened you would be thanking

me today."  The article also noted that "Moody's Investors Service thinks RadioShack may run out of cash by as early as October 2015. Analyst Mickey Chadha said, 'Absent a credible turnaround strategy to improve sales growth and increase earnings, RadioShack will be hard pressed to remain relevant in the increasingly competitive mobile phone and consumer electronics business.'"  The article further noted RadioShack's "debt-to-equity ratio is very high at 8.46 and currently higher than the industry average, implying increased risk associated with the management of debt levels within the company. To add to this, RSH has a quick ratio of 0.51, this demonstrates the lack of ability of the company to cover short-term liquidity needs."

On August 13, 2014, a *The Star-Ledger* (Newark, New Jersey) article entitled "Analysts call RadioShack revival 'highly in doubt'" reported that:

> RadioShack's turnaround attempt is "highly in doubt" and new remodeled stores are unlikely to change the electronics chain's tarnished reputation, according to a report from UBS.
>
> The company's effort to revamp its shops and product lineup "has been akin to throwing things against the wall to see what sticks," Michael Lasser, a UBS analyst in New York, said in a report.
>
> Since taking over last year, Chief Executive Officer Joe Magnacca has struggled to stem losses and sales declines at the Fort Worth, Texas-based retailer. Creditors blocked a plan to close 1,100 underperforming stores earlier this year, and the company is now in danger of being delisted from the New York Stock Exchange.
>
> The company also faces a credit crunch, he said. At the end of last quarter, RadioShack had almost $62 million in cash and about $362 million available under a credit line that comes due in 2018, compared with total debt of $614.5 million, he said.
>
> "The company is running in a perilous position with dwindling financial flexibility," Lasser said.
>
> Andrea McCauley, a Radio Shack spokeswoman, declined to comment.
>
> Magnacca is working on what he calls "five pillars" to rejuvenate the retailer, including revamping products and stores and boosting

> efficiency. On the product side, the company has added merchandise such as Beats headphones and announced a partnership with PCH International to help startups design goods for the chain.
>
> The company is promoting new interactive features at its remodeled stores, including a speaker wall and headphone demonstrations where shoppers can test items. Even if those stores perform better, "we don't think it will be enough to impact the entire chain," Lasser said. "We are skeptical that the refreshed locations will provide a halo benefit to those stores that haven't been touched."
>
> RadioShack is in danger of running out of cash in 2015, according to Moody's Investors Service.
>
> "We haven't seen any evidence of any positive impact from the turnaround plan yet," Mickey Chadha, a Moody's analyst in New York, said in an interview.

(emphasis added).

On August 20, 2014, *The New York Times* reported in an article entitled "In Need of Rewiring" that:

> RadioShack once held a central place in the imagination of young minds and the world of technology, selling one of the first mass-market computers (the TRS-80) nearly 40 years ago.
>
> But the digital revolution left it behind long ago, along with staples like tape recorders, landline answering machines and digital cameras.
>
> After nine decades in the business, the company's pulse in the electronic marketplace has grown as faint as a fading battery.
>
> Its stock price is so low -- it closed at 63 cents on Tuesday -- that it may face delisting within the next few months by the New York Stock Exchange. When it tried this spring to stop the hemorrhaging with plans to close 1,100 of its stores, its lenders balked. Some analysts predict the company could run out of cash as early as next year.
>
> ''It's been death by 1,000 cuts,'' said Anthony C. Chukumba, an analyst at BB&T Capital Markets. ''I just don't see anything the company is doing that is likely to really stop the bleeding.''
>
> The company declined to make any executives available for interviews for this article.

Three fundamental market shifts in recent years have eroded RadioShack's relevance to consumers: changes in retailing convenience, the evolution of wireless and the diminution of the market for the bits and parts that form the inner workings of many a device.

* * *

''What RadioShack didn't do was they didn't reinvent themselves,'' said Mr. Schick of Stifel. There is often trouble in the water, he continued, ''if every year that goes by, you say you'll manage.''

One effort in 2009 at reinvention, by shedding the antiquated ''Radio'' from the company name in an effort to rebrand itself as ''The Shack,'' was roundly mocked.

(The company name dates back to 1921, when two brothers, Theodore and Milton Deutschmann, founded it in Boston to capitalize on amateur or ''ham'' and ship radio operators, and they named it ''Radio Shack'' after the wooden storage room used for radio equipment on a ship.)

**_For the last year and a half, however, the company has been scrambling aggressively to right itself_**. It brought in a new chief executive, Joseph C. Magnacca, who was widely seen as successful in revamping Duane Reade before it was sold to Walgreen. Mr. Magnacca was also recently appointed to the board of American Apparel, another struggling retailer that has recently made headlines, in its case for a highly public ousting of its founder earlier this summer. A little known hedge fund, Standard General, is one of the biggest shareholders of RadioShack stock and a major stakeholder in American Apparel. A Standard General partner has a seat a on the American Apparel board along with Mr. Magnacca.

Mr. Magnacca and his team have put a plan in place to try to turn around the brand, and fill its stores with unique, higher-margin merchandise.

* * *

Despite some improvements, analysts still wonder -- as investors must, given a stock price lodged near rock-bottom -- whether it is too little, too late.

''All these turnaround strategies could work. However, we don't see any evidence of it working thus far,'' said Mr. Chadha of Moody's. ''The problem is the runway they have to make the turnaround

> strategy successful. The runway is getting shorter because the liquidity is getting worse.''

(emphasis added).

On August 27, 2014, RadioShack's stock price peaked past the $1 dollar mark, which it has struggled for months to reach, on news that hedge fund Standard General LP reportedly is considering offering the company a lifeline in the form of debt or equity.  In other words, the stock jumped on news of a potential short-term lifeline.

Thus, by no later than the summer of 2014, senior lenders wanted "to shore up RadioShack's liquidation value" in case of bankruptcy, according to Moody's, which reflected the senior creditor's "dim view of RadioShack's turnaround prospects."  Fitch, similarly, had downgraded RadioShack's rating to "CC" which is *one notch above imminent default*.

Fitch and Moody's views were far from unique.  By June 12, 2104 Scott Tilghman, an analyst at B. Riley & Co., also wrote, citing "minimal liquidation value[,]" and that "a turnaround is nearly impossible for the company" and set his price target to $0.  With little cash and little time, Tilghman said *turnaround hopes rest on crossed fingers, not hard data*: First-quarter revenue was 29 percent lower than three years ago. Same-store sales have fallen in 12 of the last 13 quarters, and declines are getting worse.  By the same time, CNN had also reported that "RadioShack's days are numbered," and a Fox News host put the company on "death watch."

On September 9, 2014, RadioShack stock fell below $1/share when Wedbush Securities analyst predicted that the Company likely will file for bankruptcy.

In a September 11, 2014 earnings call, CEO Joe Magnacca admitted that:

> It's clear that the *current pace of our turnaround is simply not fast enough to address our near term liquidity needs*. This is a fact despite the steady progress we are making with our strategic initiatives. Every day we see consumers responding positively to the key elements of our turnaround strategy such as the actions we have taken on reinvigorating our store experience, revamping our product

assortment and creating a stronger inventory position. But we know we need additional financial flexibility to move ahead with our goals.

As a result we are actively exploring options for restructuring our balance sheet and are in advance discussions with a number of parties. We are in the process of working with our key financial stakeholders including our existing lenders, bond holders, shareholders and landlords to create a long-term solution that would potentially involve a comprehensive recapitalization. This may include a store based consolidation program *and other measures to make significant reductions in our cost structure in order to provide the additional liquidity and time necessary to see the effect of our turnaround strategy.*

The details of that initiative have yet to be finalized and we are reviewing several alternatives. Let me emphasize there is no predetermined outcome to this work. Our highest priority is working on a solution to maximize the value to all our stakeholders. Perhaps for obvious reasons, we will not be in a position to provide details on our recapitalization work while it's underway. As a result we will not be having a Q&A session today. Our goal is to complete our work as soon as possible so that we can focus all our attention on executing our business plans.

(emphasis added).

A September 12, 2014 *The Tampa Tribune* (Florida) article reported, on the earnings call,

that:

RadioShack warned Thursday that it may need to file for Chapter 11 bankruptcy reorganization if it can't rework its debt or find another way to ease a cash crunch.

The struggling retailer said in a regulatory filing that it is in talks with its lenders, bondholders, shareholders and landlords to fix its balance sheet, but if it can't, it will try to file a *prepackaged bankruptcy.*

RadioShack, which is based in Fort Worth, Texas, *has been working on turning around its business for the past 18 months*. The company's efforts have included cutting costs, renovating and closing stores and shuffling management. It reported another quarterly loss on Thursday on lower revenue.

CEO Joseph Magnacca said efforts to fix the company's problems could include debt restructuring, closing more stores and other cost-cutting measures. He said the company is reviewing several alternatives, some that would need consent from lenders.

RadioShack is *quickly running out of cash and warned Thursday that it doesn't have enough left to fund its operations beyond the very near term*. The company reported $30.5 million in cash and cash equivalents on hand as of Aug. 2. That's down from $179.8 million at the end of last year.

(emphasis added).

On September 12, 2014, Fitch downgraded RadioShack to a 'C' from a 'CC' as the company is expected to have to restructure its debt in the next two months.  Fitch said the company's $585 million in senior unsecured ABL facilities is well secured, its $250 million term loan has a 71% to 90% of recovery but the $325 million of senior unsecured notes have only a zero percent to 10% chance of recovery. Radio Shack's liquidity has suffered a "major deterioration" to $183 million as of Aug. 2, down from $424 million at the end of the first quarter. The Company may need as much as $300 million of liquidity in the second half of 2014. Fitch noted it believes RadioShack *will face a shortage of funding going into the holiday season*.

Also on September 12, 2014, *The San Francisco Chronicle* reported in an article entitled "The end for venerable chain?; As cash runs out, RadioShack may be forced to close" that "The blows come on top of increasingly gloomy predictions for the 5,000-store chain, which has 15 locations in San Francisco. Some analysts cut the company's stock price target to zero."

As the *Washington Post* reported of RadioShack's plan, "[a]nalysts say the comeback strategy and a cash infusion might not be enough for RadioShack to mount a comeback. '*It's rearranging the deck chairs on the Titanic,*' said Anthony Chukumba, senior equity research analyst at BB&T Capital Markets. 'It's not enough to move the needle.'" (emphasis added).

On September 15, 2014, *CBS* reported in an article entitled "CFO bails on RadioShack in middle of cash crisis" that "RadioShack will face its **life-or-death financial crisis** without its chief financial officer" and that "CEO Joe Magnacca admitted that time is running out on the [C]ompany." (emphasis added). The Company hired a bankruptcy expert to replace its CFO, according to *ValueWalk.*

On October 4, 2014, *Zacks Investment Research* reported that RadioShack had been notified it was out of compliance with NYSE requirements because its stock had been traded below $1 for 30 straight days, and that a delisting was possible. It also noted that

> On a lighter note, after about three weeks, the activist hedge fund Standard General will officially replace a $595 million debt facility originally provided by GE capital that will allow the electronics company to tap more funds.
>
> The stock is currently trading at 99 cents per share, and up about 1.59% for the day. The stock has currently lost 62% of its value this year over concern of lack of liquidity and potential for bankruptcy.
>
> Standard General holds about a 9.8% stake in RadioShack and has less restrictive terms than GE that will allow RadioShack more mobility in obtaining funds in preparation for this upcoming holiday season. The new funding source will allow Radio Shack's liquidity to increase by at least $120 million.
>
> Current State
>
> RadioShack is down to their last $30.5 million in cash and are trying to utilize any strategy that will make the company stay afloat. Radio Shack tried to close 1,100 stores this year, but lenders did not agree with the plans and ended up only closing 200 stores this year.
>
> Hopefully the liquidity injection will help turn the company around. After all, the funds they will be receiving of $ 595 million is about 6 times their current market capitalization and about 14% of their trailing twelve month revenue.
>
> The net income has significantly decreased by 158.8% when compared to the same quarter one year ago, falling from -$53.10 million to -$137.40 million. Net operating cash flow has

significantly decreased to -$87.20 million or -289.15% when compared to the same quarter last year.

The company said last month that it has liquidity of $182.5 million, including $30.5 million in cash.

Grinding it out

*RadioShack has been under the microscope by Wall Street and investors on how they will turn around their failed business plan.* Now that the holiday season is coming around the corner, more pressure has been added on the electronics store to implement a strategy to satisfy investors this holiday season.

Some investors think this is not possible due to the lack of overall market adaptation capability by Radio Shack when compared to the e-commerce giants eBay, Amazon and now maybe even Alibaba in the future.

Possible Solution

One possible solution for the lackluster electronics company would be to completely rebrand or to become a pure online only venue and in so doing drastically lower their overhead.

The business model these days for shopping is being transformed from in store transactions to huge online showrooms. E-commerce is going to be a huge sector within retail in the next decade that could possibly completely overtake in store transactions. To make a truly engaging in-store experience that would draw people in requires an investment that is difficult to sell enough merchandise to support without the buying power of a Wal-Mart.

Bottom Line

RadioShack has a steep hill that is only getting steeper as the holidays approach. They have begun their strategy with partnering with Standard General that will allow them to access more funds. This in turn will allow them to attempt a better strategy to attract customers and generate revenue.

With the possibility of the NYSE giving a delisting notification, RadioShack is in the home stretch to the white light of businesses and investors will have to wait and see if the electronics company has any more batteries left.

(emphasis added).

On October 7, 2014, *DallasNews.com* reported in an article entitled "Cool reception for RadioShack" that

> RadioShack's new temporary financing package announced late Friday failed to get a big round of support from investors when its shares resumed trading Monday.
>
> The stock didn't trade Friday pending the company's announcement of a new debt agreement with shareholders Standard General and Litespeed. RadioShack's stock price fell 12 cents, or 12 percent, to close at 87 cents a share Monday.
>
> RadioShack's two largest shareholders are providing $120 million to be used as collateral for its letters of credit. Also, Standard General replaced GE Capital as lead lender under RadioShack's $535 million senior secured asset based credit line.
>
> Fitch Ratings analyst Monica Aggarwal said the new financing plan is a ***"short-term respite" to RadioShack's bigger issues.***
>
> "Fitch still believes the risk of a restructuring, in or outside of bankruptcy, including a distressed debt exchange, that is detrimental to bondholders remains high over the next several months given the material deterioration in liquidity and no visible signs that RadioShack can turn operations around," Aggarwal said in a report Monday.
>
> The retailer has many hurdles to scale, she said. As of Aug. 2, the end of its second quarter, RadioShack had $31 million in cash and $152 million of available credit on its revolver.
>
> The $120 million from Standard General and Litespeed is later convertible into stock and will dilute current RadioShack shareholders' holdings.
>
> After it is converted to stock, the investment from the two New York-based hedge funds will result in 300 million additional shares outstanding. That means that existing shareholders will own about 25 percent of the equity once the conversion is complete, Wedbush analyst Michael Pachter said.
>
> RadioShack said the new credit line will allow it to fund inventory to stock stores for the holiday shopping season.
>
> RadioShack stock has been trading above and below $1 in recent months and the company has already received a delisting notification from the New York Stock Exchange. The company has

> until early next year to cure its stock price. But it needs a
> restructuring plan to do that.

(emphasis added).

Reporting on the Company's temporary financing, an October 6, 2014 *Dallas Business Journal* article entitled "Analysts: RadioShack's latest lifeline delays 'ultimate demise'" stated:

> Analysts don't think RadioShack Corp.'s latest financing package is
> going to be the answer to the struggling retailer's financial issues.
>
> Analysts are calling the lifeline a stopgap measure, according to
> Bloomberg.
>
> As a result, RadioShack's (NYSE: RSH) stock fell 12 percent on
> Monday, closing at a price of 87 cents per share.
>
> RadioShack announced the deal between New York-based hedge
> fund and shareholder Standard General LP and other investors Oct.
> 3. It included a $120 million investment that would later be
> converted to equity. Standard General and the other investors also
> planned to replace GE Capital as lead lender under RadioShack's
> senior secured credit facility, giving the retailer immediate access to
> additional liquidity.
>
> "While we believe this financing package should allow RadioShack
> to avoid a near-term bankruptcy filing, ***it comes at a heavy cost to
> existing shareholders and may only serve to forestall its ultimate
> demise***," BB&T Capital Markets analyst Anthony Chukumba said
> in his latest report Monday.
>
> Analysts Michael Patcher of Los Angeles-based Wedbush
> Securities and Scott Tilghman of Boston-based B. Riley & Co. has
> set their price target at $0.
>
> Tilghman said the deal only delays bankruptcy until after the
> holidays, Bloomberg reported. Meanwhile, Patcher said that if the
> new investment is converted to equity of 300 million shares, that
> will only leave stockholders with 25 percent of ownership, reported
> Bloomberg.
>
> RadioShack CEO Joseph Maganacca previously said the deal was
> an important step that would help the company complete its
> turnaround. He also said that the company was in discussions with
> term lenders to address the next steps in recapitalization.

> Prior to that deal, RadioShack was seeking additional capital to help it continue its turnaround. Magnacca previously said that the company could restructure its debt, consolidate its stores or file for bankruptcy.

(emphasis added).

On October 30, 2014, *The Boston Globe* reported in an article entitled "RadioShack hires turnaround help" that:

> RadioShack has hired former Treasury Department adviser Harry J. Wilson to help with its turnaround efforts.
>
> The struggling consumer electronics retailer said Wednesday that Wilson will serve as chief revitalization officer, reporting to its board and CEO Joe Magnacca.
>
> Wilson is the founder and CEO of The Maeva Group. He previously served as a senior adviser in the Treasury Department and was a senior member of the Auto Task Force, which was responsible for the Treasury's role in the restructuring of General Motors and Chrysler.
>
> David Schick of Stifel Nicolaus said in a client note that Wilson's background "brings expertise and gravitas toward a turnaround or restructuring." Still, the analyst said that he continues to believe that RadioShack needs more capital infusions and flexibility from lenders or it may run out of capital some time in 2015.
>
> RadioShack warned in September that it might file for Chapter 11 bankruptcy protection as it struggles to compete. The company has been trying to turn around its business for more than 18 months. It has cut costs, renovated and closed stores, and shuffled management.

A November 16, 2014 *Fort Worth Star-Telegram* (Texas) article entitled "RadioShack lines up new products, ads, policies for critical holiday season" noted in relevant part:

> The future of the company is likely at stake [this holiday season]. While new financing provided by a group led by a major shareholder, the Standard General hedge fund, added $120 million in liquidity to help the company stock stores for the holidays, a weak holiday season could leave the company vulnerable after the new year. In the first half of the current fiscal year, same-store sales have declined by 17 percent.

"This holiday season is especially critical for RadioShack," said Dwight Hill, a Dallas-based consultant with the Chicago firm McMillan Doolittle.

"They have a cash infusion that should carry them through the critically important holiday season, but the underlying cracks still exist in their business model," Hill said.

"They have too many stores that are too reliant on a highly competitive and low-margin category — smartphones," the analyst went on. "They have so far managed to stave off bankruptcy which is good for them. But I believe if they don't outperform for holiday, their ability to get needed credit becomes difficult or too expensive."

By December of 2014, the *Los Angeles Times* reported that "Harbingers of Radio- Shack's imminent demise are everywhere" and that the Company "disclosed then that 'we may not have enough cash and working capital to fund our operations beyond the very near term' and mentioned the possibility of bankruptcy. Since then, its largest shareholder, the hedge fund Standard General, has given it a little financial breathing room to show progress, but its forbearance could run out early next year. On Tuesday, two of its lenders said it had breached its loan agreements; the company called that assertion 'wrong and self-serving.'"

On December 6, 2014, *Bloomberg* reported in an article entitled "RadioShack to End 401(k) Match, Closing Up to 1,100 Stores to Cut Costs" that:

Struggling electronics retailer RadioShack Corp. will stop matching employees' retirement-fund contributions and close stores to help cut costs. RadioShack will discontinue matching for Section 401(k) and similar plans in Puerto Rico—Section 1165(e) plans—on Feb. 1, according to an internal memo from Chief Executive Officer Joe Magnacca that was obtained by Bloomberg. The company plans to close as many as 1,100 stores in its next fiscal year, contingent upon consent from lenders, some of which have blocked attempts to shut them. RadioShack is also reviewing health benefits, according to the memo.

"As a result of these ongoing cost reductions, we are making several difficult but necessary decisions that will allow us to further contain costs and expenses," Magnacca said in the memo.

> RadioShack is continuing to look at cost-saving measures, said Merianne Roth, a spokeswoman for the Fort Worth, Texas based company. She declined to comment on the memo.
>
> The electronics retailer, which has lost money in each of its 10 latest quarters, is trying to stem losses that it has said could force it to seek bankruptcy. A turnaround plan that would have shuttered as many as 1,100 underperforming stores was previously rejected by creditors including Salus Capital Partners LLC, a unit of Harbinger Group Inc.
>
> Salus, an investment firm that extended the retailer a $250 million term loan last year along with Cerberus Capital Management LP, said in a letter the week of Dec. 1 that RadioShack was in default on the obligation and was demanding repayment, a move that may complicate a turnaround.
>
> RadioShack is seeking a forbearance agreement from Salus to defer efforts to force an immediate default on the second-lien term loan and to engage in talks at the start of 2015, according to a person with knowledge of the matter. The retailer wants the deferral so it can focus on sales during the crucial holiday season, said the person, who asked not to be named because the matter is private.

As of the filing of this Complaint, RadioShack common stock continues to be an imprudent retirement savings vehicle because of the unusually high likelihood of its bankruptcy.

## MISMANAGEMENT OF PLANS ASSETS

Pursuant to ERISA Section 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plans with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plans so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

Defendants breached their fiduciary duties in that they knew or should have known the facts alleged above, and/or knew or should have known that the Plans should not have invested in RadioShack common stock during the Relevant Period.

## **CAUSATION**

RadioShack's stock price collapse of over 94%[4] devastated the Plans' assets, which devastation could and would have been avoided in whole or in part by Defendants complying with their ERISA fiduciary duties, which fiduciary duties included the options to, for example and not as an inclusive list: investigating whether RadioShack was a prudent retirement investment; retaining outside advisors to consult them or to act as fiduciaries; seeking guidance from governmental agencies (such as the Department of Labor or Securities & Exchange Commission); resigning as fiduciaries of the Plan; stopping or limiting additional purchases of RadioShack by the Plans.

Despite these and other options, Defendants—who knew or should have known that RadioShack was an imprudent retirement investment—choose to, as fiduciaries, ignore the Plans' investment in RadioShack stock and to continue allowing the Plans to acquire further RadioShack stock, while taking no action to protect their wards as RadioShack's condition worsened and the Plans' Participants' retirement savings were decimated.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plans and their Participants.

The Plans suffered tens of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company securities during the Relevant Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plans' Participants.

---

4



Defendants failed to accurately apprise the Participants of the problems within the Company (as set forth above) and of the fact that Company stock was generally an imprudent investment option as described above.  Upon information and belief, fiduciary communications failed to convey the extreme risks faced by RadioShack.  Moreover, as further described above, Defendants misrepresented the soundness of Company securities as an investment vehicle by allowing the Plans to hold RadioShack's common stock.  As a consequence, regardless of any ability to divest, participants did not exercise independent control over their investments in the Company securities, and Defendants remain liable under ERISA for losses caused by such investment.

Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and Participants would have avoided a substantial portion of the losses that they suffered through their continued investment in Company stock.

Despite their fiduciary duties, Defendants failed to protect the Participants' retirement savings from being imprudently invested in RadioShack stock, and as a result, the Plans and the Participants suffered substantial losses.  A prudent fiduciary facing similar circumstances would not have stood idly by, as Defendants did here, while the Plans lost millions of dollars through continued investing in additional imprudent RadioShack common stock.  Instead, Defendants allowed the Plans to purchase hundreds of thousands of shares according the Plans' Forms 11-K, as shown above in ¶ 0.

The following alternative options—which are pleded as alternative statements under Fed. R. Civ. P. 8(d)(2) to the extent they are inconsistent— were available to Defendants and (a) could have been done without violating securities laws or any other laws; (b) should have been done to

fulfill Defendants' fiduciary obligations under ERISA; and, (c) would not have been more likely to harm the Fund than to help it.

**Alternative One: Freezing Company Stock Purchases**

As shown above in ¶ 0, the Plan made considerable investment in RadioShack stock during the Relevant Period.  To the extent these purchases were made by a unitized stock fund, the Fund's cash buffer could have been increased.  Defendants could have and should have directed that all Company and Participant contributions to the Fund be held in cash rather than be used to purchase RadioShack common stock.  The refusal to purchase Company stock in the Fund is not a "transaction" within the meaning of insider trading prohibitions.

Alternatively, to the extent the assets were or were not held in a unitized stock fund, the ability of any Participant to direct more than a reasonable percentage of his or her account into the Fund could have been limited.

Alternatively, Defendants should have closed the Fund itself to further contributions and directed that contributions be diverted from the Fund into other (prudent) investment options based upon Participants' instructions, or, if there were no such instructions, the Plans' default investment option.

These actions would not have required any independent disclosures that could have had a material adverse effect on the stock price.

**Alternative Two: Complete Liquidation of the Plans' Holdings**

Because Defendants could and should have concluded that RadioShack stock was an imprudent retirement savings vehicle based solely upon public information, no disclosure was required before conducting an orderly liquidation of the Plans' holdings.

**Other Alternatives Available to Defendants**

Defendants also could have, *inter alia*, and by way of example not limitation:

- Sought guidance from the DOL or SEC as to what they should have done;

- Resigned as Plans fiduciaries to the extent they could not act loyally and prudently;

- Retained outside experts to serve either as advisors or as independent fiduciaries, or;

- Limited Participant accounts to a certain maximum account percentage being invested in RadioShack stock.

Despite the availability of these and other options, Defendants took no meaningful action to protect Participants from losses as a result of the Fund's imprudence.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

As noted above, as a consequence of the Defendants' breaches, the Plans suffered significant losses.

ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.

In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been properly administered.

Plaintiff, the Participants, the Plans, and/or the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans (on both a Plans-wide basis and an Individual Account basis) resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (3) taxable costs; (4) interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## COUNT I

### Failure to Prudently and Loyally Manage the Plans' Assets

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
Against All Defendants)

Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plans and/or disposition of the Plans' assets.

Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are

responsible for ensuring that assets within a plan are prudently invested.  Defendants were responsible for ensuring that all investments in Company stock by the Plans were prudent and that such investment was consistent with the purpose of the Plans.  Defendants are liable for losses incurred as a result of such investments being imprudent.

A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by a the plan, including plan trustees, to do so.

Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plans or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans.  This duty to inform participants included an obligation to provide the Participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information regarding Plans investments/investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans.

Defendants breached their duties to prudently and loyally manage the Plans' assets.  During the Relevant Period, Defendants knew or should have known that, as described herein, RadioShack securities were not a suitable and appropriate investment for the Plans.  Investment in Company securities during the Relevant Period clearly did not serve the Plans' purpose, and was clearly too

risky for retirement savings.  Yet, during the Relevant Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plans' Participants from the inevitable losses that they knew or should have known would ensue as a result of the above-described problems.

Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's likelihood of survival.  During the Relevant Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed Participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in Company stock.  As such, Participants in the Plans could not appreciate the true risks presented by investments in the Company stock and therefore could not make informed decisions regarding their investments in the Plans.

Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in, or knowingly undertaking to conceal, the other Defendants' failures to: (a) adequately review the prudence of Company stock as a Plans investment and (b) take appropriate action to ensure that the Plans' assets were prudently invested by, *inter alia*, disclosing crucial information regarding the Company's operations and, instead, incorporating by reference into fiduciary communications information they knew or should have known was, at best, incomplete.  Defendants had or should have had knowledge of such breaches by other Plans fiduciaries, yet made no effort to remedy them.

As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and the Participants lost a significant portion of their retirement investment.

Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Adequately Monitor Other Fiduciaries and
### Provide Them with Accurate Information

### (Breaches of Fiduciary Duties in Violation of ERISA § 404 Against RadioShack and the
### Monitoring Defendants)

Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

At all relevant times, as alleged above, Defendant RadioShack and the Monitoring Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

At all relevant times, as alleged above, the scope of the fiduciary responsibility of RadioShack and the Monitoring Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the appointed Plans Committees and all other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

The duty to monitor entails both providing information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, RadioShack and the Monitoring Defendants, had the duty to:

(a)      Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must have been knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

(b)     Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plans' investments;

(d)     Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintained adequate records of the information upon which they base their decisions and analysis with respect to the Plans' investments; and

(f)     Ensure that the monitored fiduciaries reported regularly to RadioShack and the Monitoring Defendants.  The Company and/or the Monitoring Defendants must have then reviewed, understood, and approved the conduct of the hands-on fiduciaries.

Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

RadioShack and the Monitoring Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries (the Committee Defendants) had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries (the Committee Defendants) completely appreciated the huge risk of significant

investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to almost certain significant depreciation.  RadioShack and the Monitoring Defendants knew or should have known that the fiduciaries they were responsible for monitoring (the Committee Defendants) were (i) continuing to invest the assets of the Plans in Company stock when it no longer was prudent to do so, and (ii) imprudently allowing the Plans to continue offering Company stock as an investment alternative.   Despite this knowledge, RadioShack and the Monitoring Defendants failed to take action to protect the Plans, and concomitantly the Plans' Participants, from the consequences of these fiduciaries' failures.

In addition, RadioShack and the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries (the Committee Defendants) accurate information about the financial condition of RadioShack that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to fail to disclose such information to the monitored fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

RadioShack and the Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants and beneficiaries, lost a significant portion of their retirement investments.

Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Co-Fiduciary Liability

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 Against all Defendants)

Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

This Count alleges co-fiduciary liability against all Defendants.

As alleged above, during the Relevant Period the Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Defendants breached all three provisions.

ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Here, the Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

RadioShack, through its directors and employees, engaged in violations of ERISA and profited from such practices, and, thus, knowledge of such practices is imputed to RadioShack as a matter of law.

The Committee Defendants, by virtue of the public knowledge of the same, participated in and/or knew about the RadioShack's problems as described herein, yet failed to undertake any effort to remedy these breaches.

ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. RadioShack also, as a *de facto* fiduciary, participated in all aspects of the fiduciary breaches of the other Defendants.

ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

The failure of Defendants to monitor co-fiduciaries enabled the co-fiduciaries to breach their duties.

As a direct and proximate result of Defendants' breaches of fiduciary duties, the Plans, and indirectly Plaintiff and the other Participants, lost a significant portion of their retirement savings.

Pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2) Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants jointly and severally for:

      A.      Actual damages in the amount of any losses the Plans suffered, with such losses to be allocated among the Plans Participants' individual accounts in proportion to the accounts' losses;

      B.      Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

      C.      Costs pursuant to 29 U.S.C. § 1132(g); and

      D.      Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury of all issues so triable.

Dated: December 17, 2014

        /s/ William B. Federman
        William B. Federman (TBA #00794935)
        Gregg J. Lytle (TBA# 24086288)
        **FEDERMAN & SHERWOOD**
        10205 N. Pennsylvania Avenue
        Oklahoma City, Oklahoma 73120
        Telephone: (405) 235-1560
        Facsimile: (405) 239-2112
        wbf@federmanlaw.com
        gjl@federmanlaw.com

            -and-

        2926 Maple Ave., Suite 200
        Dallas, TX  75201

        Michael J. Klein
            **STULL, STULL & BRODY**
        6 East 45th Street
        New York, NY 10017
        Telephone: (212) 687-7230
        Facsimile: (212) 490-2022
        (*Pro Hac Application to be filed*)

        ***Counsel for Plaintiff***